[No. 3088.]

## BILL TRIMBLE *v.* THE STATE.

1. ROBBERY—ARREST OF JUDGMENT.—INDICTMENT for the offense of robbery which pursues, substantially, the common law precedents for that offense is sufficient. It is not, however, always sufficient to charge an offense in the exact words of the statute defining it, the rule being that the facts constituting the offense must be alleged by direct, positive and certain averments, and not by way of argument or inference. Failing to allege that the party robbed was the party assaulted by the defendant, and put in fear of his life or bodily harm, the indictment, in this case, is insufficient, wherefore the motion in arrest of judgment should have prevailed. See the opinion *in extenso* on the question.

2. EVIDENCE—MOTIVE.—In a trial for robbery, the prosecuting witness was asked, upon cross-examination, if he did not, just before the institution of the prosecution, have a conversation with the defendant regarding the latter's knowledge of an alleged incestuous intercourse between the witness and his neice. *Held*, admissible on the question of the *animus* of the witness, for which reason, as shown by the bill of exceptions, the question was propounded; and the trial court erred in refusing to require the witness to answer.

3. SAME—NEW TRIAL.—See evidence *held* insufficient to establish guilt beyond a reasonable doubt, and newly discovered evidence of such character as to have authorized and required the award of a new trial.

APPEAL from the District Court of Rains. Tried below before the Hon. G. J. Clark.

The offense attempted to be charged by the indictment in this case was the robbery, by the appellant, in Rains county, on the twenty-sixth day of October, 1883, of Henry Ivy, by assault and violence, and putting in fear of life and bodily injury. The conviction of the appellant was supplemented by a term of two years in the penitentiary, as punishment.

Henry Ivy was the first witness for the State. He testified that he lived seven miles from the town of Emory, in Rains county, Texas. Witness was acquainted with the defendant, whom he pointed out in court, and had known him ever since he was a small boy. On the twenty-fifth or twenty-sixth day of August, 1883, witness was going home from the town of Emory, and met defendant in a lane, about three hundred yards from his, the witness's, house. Defendant asked of witness if he had been to town to report him. Witness replied that he had not; that he would make reports on nobody. Defendant replied: "If I thought you had, I would leave you lying right here." He then put his pistol to the witness's side, and asked witness how much money he had. Witness replied that he had between ten and fifteen dollars. With his pistol still presented, he told witness to hand it out, which, in fear that defendant would kill him if he refused, the witness did. The money was all in silver. Defendant took it, saying that he was going to leave the country, and that if witness reported on him for this robbery, he would return and kill the witness. This all occurred in Rains county, Texas, on either the twenty-fifth or twenty-sixth day of October, 1883. The witness did not know which. He was in Emory on both of those days, and it was on his return on either one or the other that he was assaulted and robbed by defendant as stated. It was either Thursday or Friday. It was about an hour or an hour and a half after dark. The moon was about an hour high, and was shining brightly. Witness knew that he saw the moon, but could not say for certain that no rain had fallen. Witness did not tell Grogan Williams, in the presence of Logan Williams or any one else, a few days after he, witness,

made this complaint, near Cain's store, in the town of Emory, that defendant had robbed him on the Thursday before, about sundown, or a little after. Witness had no recollection that Mr. Grogan Williams ever asked him about when the robbery was perpetrated. He had no recollection of telling Grogan Williams that the robbery occurred on the day of a certain sale of property of Mr. Forbis, of which witness told Grogan Williams. The defendant lived at the house of Mr. Logan Williams, about three miles distant from the house of witness. Witness did not tell Jim Coats, at Coats's house, on Sunday, October 28, 1883, that the robbery occurred about sundown, or a little after. Witness had no recollection of having had a conversation with Jim Coats about this matter, at any time or place. The State rested.

Logan Williams was the first witness for the defense. He testified that the defendant was living with him on the twenty-fifth and twenty-sixth days of October, 1883. Witness's place was about three miles distant from that of the State's witness Ivy. The witness could not, of his own knowledge, say where the defendant was on Thursday, the twenty-fifth day of October, 1883. On the evening of the twenty-sixth, which was Friday, witness had the defendant helping him to dig potatoes. That was a drizzly evening. Defendant quit that work about two hours by sun, and witness saw no more of him that night. On the next morning, which was Saturday, the defendant took a load of potatoes to Emory for the witness. He was arrested that day while in town. Witness was present at the time, and heard a conversation between Grogan Williams and Ivy, the prosecuting witness. Ivy told Grogan Williams, in the presence of the witness, near the store of T. M. Cain, only a few days after the arrest of the defendant. that the defendant robbed him just after sundown. Grogan Williams told Ivy that he asked that information on behalf of the defendant, who wanted to know the time of which he was charged with the commission of the offense. Frank Trimble and two colored men, besides the witness, were present at the time this conversation between Ivy and Grogan Williams transpired.

Grogan Williams was the next witness introduced by the defense. He testified that, a few days after the arrest of the defendant, he met the State's witness Ivy near Cain's store, in the town of Emory, and asked him to tell him when it was that the defendant robbed him. The witness Ivy, in the presence of Lo-

gan Williams, Frank Trimble and two colored men, at that time and place, told the witness that the defendant robbed him on the previous Thursday evening, just after sundown. Witness then asked him if it was on the day that witness met him on his way to town, when, in reply to witness's inquiry as to where he was going, he replied, "to Forbis's sale." Ivy replied that he believed that it was. That day the witness stated was Thursday, October 25, 1883. Witness then told Ivy that he had asked the question at the instance of the defendant, who was then in jail. Ivy did not then appear at all excited or frightened.

Frank Trimble was the next witness for the defense. He testified that he had known the defendant all his life. Defendant was a negro who belonged to the witness's father until he was freed at the close of the war. This witness corroborated the testimony of Grogan Williams as to what passed between him, Williams and Ivy, during the conversation in Emory, near Cain's store.

Jim Coats was the next witness for the defense. He testified that he saw the prosecuting witness Ivy on the Sunday following the night of his alleged robbery. He, Ivy, was at the house of the witness, and told the witness then and there that the defendant robbed him before dark, just about sundown, or a little after. Witness saw the defendant on Thursday, October 25, 1883. He, the defendant, was at a cotton picking, on the farm of the witness, occupied by a tenant named Jim Middleton. The defendant was there all day, and did not leave Middleton's until after dark. Witness knew this, because he talked with defendant at Middleton's, and saw the defendant leave there, after dark, with one Jess Martin, saying he was going to prayer meeting. Middleton lived a mile and a half distant from Ivy.

Jess Martin testified, for the defense, that he and the defendant were at Middleton's cotton picking on Thursday, October 25, 1883. They left Middleton's house about dark, or a little after, and went to a prayer meeting at Ashford Kirby's. The defendant and the witness walked side by side all the way, and at no time or place en route did they meet or see Henry Ivy. They went straight into Kirby's house when they reached it, and when the witness left there, he left the defendant in Kirby's house. In going to Kirby's the witness and defendant passed through Ivy's lane. Kirby's house stood five or six hundred yards beyond Ivy's.

John Murray testified, for the defense, that just before dark,

on the evening of Thursday, October 25, 1883, he rode up to the house of Jim Middleton, on his way to a prayer meeting at Ashford Kirby's. He saw the defendant at Middleton's, and asked him if he was going to the prayer meeting. He replied that he was, and shortly afterward witness saw him and Jess Martin start off in the direction of Kirby's. They were walking and witness riding. When witness reached Kirby's, defendant was there, in the house, and he was in the house when the prayer meeting broke up, after nine o'clock. Witness left him there.

Ashford Kirby testified, for the defense, that the defendant, in company with one Jess Martin, came to a prayer meeting at witness's house. After the prayer meeting closed, the defendant and the witness sat up and talked for two hours, or more. Defendant spent that entire night with witness. The two did not go to bed until after eleven o'clock. Defendant left the witness's house, next day, Friday, about eight or nine o'clock. Henry Ivy, the prosecuting witness, came to witness's house on that Friday morning before the defendant left. He and the defendant met, talked and laughed in a perfectly friendly manner. Ivy said nothing then about being robbed on the evening before. Ivy came to the witness's house on the Sunday following, and told the witness that the defendant robbed him on the preceding Thursday evening, a little after sundown, and tried to induce the witness to testify that he knew all about it. Witness replied that he could only truthfully say that he knew nothing about it.

W. F. Montgomery, R. W. Rabe and James Garrett were introduced by the State. Each testified that they were acquainted with the reputation of the witness Ivy for truth and veracity, and that it was good.

The original motion for new trial was based upon the insufficiency of the evidence to support the judgment. A supplemental motion set up that, after the witness Ivy testified that the robbery occurred about an hour and a half after dark, when the moon was more than an hour high, the defendant's counsel made diligent search for an almanac throughout the town, and continued, without success, to search for one until a verdict was reached; that, after a verdict was reached, an almanac was found, which showed that the moon did not rise on the night of the robbery until twenty-eight minutes after one o'clock in the morning; that the jurors had informed him that, had this evi-

dence been produced, they would have rendered a verdict of acquittal.

*H. W. Martin*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. 1. An indictment for the offense of robbery which pursues, substantially, the common law precedents for that offense is sufficient. (*Burns* v. *The State*, 12 Texas Ct. App., 269.) But the indictment in this case does not follow such precedents. It charges as follows: "That Bill Trimble, late of the county of Rains and State of Texas, did, with force and arms, in the county of Rains and State of Texas, on the twenty-sixth day of October, A. D. 1883, by assault and by violence, and putting in fear of life and bodily injury, unlawfully and fraudulently take from the person and possession of Henry Ivy ten dollars in money," etc. This charge is in the precise words of the statute defining robbery; but it is not always sufficient to charge an offense in the words of the statute defining it. An indictment must allege the facts which constitute the crime, by averments direct, positive and certain, and not by way of argument and inference. (*Moore* v. *The State*, 7 Texas Ct. App., 608.)

In this indictment it is not averred that Ivy, the party alleged to have been robbed, was assaulted by the defendant, or was put in fear of life or bodily injury. It is not averred who it was that was assaulted or put in fear by the defendant. It might be argued or inferred from the statement contained in the indictment that Ivy was the person so assaulted and put in fear, but we must not resort to argument or inference to ascertain the meaning of allegations in an indictment. It might have been a fact that some other person than Ivy was assaulted and put in fear by the defendant, and that by means of such assault or putting in fear Ivy was robbed. If such were the case, the indictment should so allege, and name the party so assaulted and put in fear. It is as reasonable to conclude from the allegations in the indictment that Ivy was robbed by means of an assault upon another person, or by means of putting another person in fear, as that the robbery was effected by an assault upon him, or by putting him in fear. We have found no precedent, and we think none can be found, which would sustain this in-

dictment. In all the precedents for this offense which we have examined, the averments as to the assault, and putting in fear, are directly and positively made, naming the person assaulted or put in fear. (1 Whart. Prac., 410; 2 Arch. Crim. Prac. and Pl., 521; 2 Bish. Crim. Pro., sec. 1002; *Reardon* v. *The State,* 4 Texas Ct. App., 603; *Burns* v. *The State,* 12 Texas Ct. App., 269.) We are of the opinion that the court erred in not sustaining the defendant's motion in arrest of judgment, based upon the insufficiency of the indictment.

2. On cross-examination of the witness Ivy, defendant's counsel asked him if he had not, just before instituting this prosecution, had a conversation with defendant about defendant's knowledge of an alleged incestuous intercourse between witness and his niece. On objection made by the State the witness was not permitted to answer the question. In the bill of exceptions taken to this ruling it is stated that this question was asked "for the purpose of showing the *animus* of the witness, and the motive the said witness could have in prosecuting the defendant." We think that for this purpose the question was proper, and that the witness should have been permitted and required to answer it. (Whart. Crim. Ev., secs. 476, 477.)

3. We are of the opinion that the court erred in overruling defendant's motion for a new trial. To our minds the testimony of the only State's witness, Ivy, as presented to us in the record, is of a very unreliable and unsatisfactory character, when considered in connection with the other evidence in the case. It by no means establishes in our minds the guilt of the defendant beyond a reasonable doubt. We think furthermore that the newly discovered evidence shown by the motion for a new trial was material, and would be likely to change the result on another trial. In our opinion the motion should have been granted upon this ground, if upon no other.

The judgment is reversed, and because the indictment is fatally defective the prosecution is dismissed.

*Reversed and dismissed.*

Opinion delivered May 3, 1884.